## CERASEAL CHEMICAL CORP. v. DESIGN ENGINEERING CO.

### Civ. A. No. 1797.

United States District Court
D. Minnesota, Third Division.

June 27, 1951.

Cleon Headley and Herbert Gurnee, by A. Laurence Davis, all of Morgan, Headley, Raudenbush & Morgan, St. Paul, Minn., for the plaintiff.

Faricy, Burger, Moore and Harry Costello, Jr., by William A. Bierman, St. Paul, Minn., for the defendant.

DONOVAN, Judge.

The above-entitled matter was tried to the court, at the City of St. Paul, Minnesota, on the 8th, 9th and 12th of March, 1951, further trial being then continued to the 24th of April, 1951, upon which date the trial was completed.

Plaintiff brings this action for money had and received, and for conversion of property claimed to be owned by it. Defendant, by answer, alleges payment in full of all accounts due plaintiff, and denies the conversion. It also counterclaims for alleged breach of contract.

At the trial, and before testimony was taken, defendant admitted a credit balance in favor of plaintiff in the sum of $4,080.60, but contends plaintiff is indebted to defendant in excess of said balance by reason of the claimed breach of contract. Defendant assumed the burden of proving its counterclaim, as it admitted that it had received $4,080.60 as an advance by plaintiff, but this has been credited by defendant to expense incurred in connection with the contract they claim plaintiff breached. Throughout, the trial counsel referred to plaintiff as "Ceraseal" and to defendant as "Design." Consistent therewith, the parties will hereinafter be designated in like manner.

Design is a Minnesota corporation which engaged in manufacturing products, including a portable glycolator or vaporizer, at its plant in St. Paul, Minnesota.

Ceraseal is an Indiana corporation. Its agents, impressed with the possibilities of marketing Design's vaporizers, conferred with agents of Design from time to time, representing that Ceraseal would engage in an extensive advertising campaign with a view to selling the vaporizers to the public, and particularly to poultry raisers. Ceraseal and Design agreed on a price for the vaporizers and an order for 1,000 units initiated the agreements and disagreements that followed. Visits in person and by telephone disclosed that while Design was possessed of engineering skill and com-

mendable industry, it lacked the capital necessary to keep step with Ceraseal's high-powered salesmanship. As a result, Ceraseal advanced money to Design, which furnished some needed working capital, and which was to be applied to orders supplied by Ceraseal as distributors of the product. Ceraseal complained that production by Design was falling too far behind purchase orders forwarded for shipment to the trade, and additional telephone conversations resulted in a conference between the parties at Ceraseal's offices on or about June 6, 1949. Not a scratch of a pen was made by either party to express the understanding and intent of the parties, until the summer of 1949.

Ceraseal's anxiety over money advanced Design and not accounted for led to some discussion between the parties relative to the need for an understanding with reference to "Sight Draft Bill of Lading shipments." 1

Ceraseal evidenced a studied attempt to avoid any positive commitment towards liability for orders except as obtained by it from the trade, but finally did represent to Design that Ceraseal could handle 500 vaporizers per week. By the end of June, 1949, it became obvious that what each party had originally visualized with so much enthusiasm was headed for the shoals. Ceraseal had advanced money and obtained orders, and Design had purchased parts and made preparation for production of 2,500 or 3,000 units per month.

Ceraseal sent its top officers to St. Paul for a conference with the top officers of Design, on July 6, 1949. At the trial said officers were witnesses, and they were thoroughly disagreed as to what was said, done and agreed upon. However, the day following this meeting Ceraseal dispatched a letter to Design, purporting to summarize the conversations of the officers present.2

1.                             "June 6, 1949
"Empire National Bank & Trust Co.
"360 Robert Street
"St. Paul, Minnesota     ·
    "Attention—Robert   Fayfield.
"Gentlemen:
    "In confirmation of conversations with myself, Mr. Paul Abraham, Mr. W. T. Winter regarding the opening of an account at the Empire National Bank for the collection of receipts on Sight Draft Bill of Lading shipments made by the Design Engineering Company of St. Paul to the accounts of the Ceraseal Chemical Corporation of Lafayette, Indiana.

    "As discussed with you today, Sight Draft Bill of Ladings will be made payable to the Empire National Bank of St. Paul. Proceeds from the Sight Drafts will then be distributed as follows: 36% of the amount collected shall be transferred to an account of the Ceraseal Chemical Corporation of Lafayette, Indiana. 64% of the proceeds shall be transferred to the account of the Design Engineering Company of St. Paul, Minnesota. These percentages shall be figured after the net amount of the collection is made less the collection charges. It is requested that the duplicate deposit slip of the amount deposited to each account be mailed to the respective companies after each collection is made.

    "This letter is your authorization to make distribution of the amounts as stated above after the collection of each

of the drafts. It is duly signed by officers of each of the respective corporations.
        "Yours very truly,
        "Design Engineering Co., Inc.
    [signed. "E. H. Colestock
        By:  E. H. Colestock, Pres.
    "EHC:jk
    "Countersigned:
                    Ceraseal Chemical Corp.
        [signed] "P. A.
        "By:  Paul Abraham, Vice Pres."

2.                             "0156
"P. O. Box 383     Lafayette, Indiana
                    "July 7, 1949
"Design Engineering Co.
"310 Cedar St.     ·
"St. Paul, Minnesota.
"Attention:  Messrs:  Colestock
                    Hauber
"Gentlemen:
"In confirmation and summarizing our conversations between both of you, Mr. W. T. Winter and myself on July 6, 1949, it was mutually agreed:
that you would have a unit in Underwriter's Laboratory by July 11;
that you were going to institute a very careful thermostat inspection immediately;
that you were to have furnace unit samples to us by July 20, 1949;
that you would have the radio interference taken care of by August 1, 1949;

Except for negative action taken on sales and patent agreements referred to, the letter remained unanswered by Design. At the trial Design claimed they proceeded on the understanding that they were to produce 3,000 per month, and that except for orders delivered in the amount of 1,000 or 1,200, they could not carry on because, in the words of its president, "We just didn't get enough orders to justify production. * * * We were then in desperate circumstances * * * and told them we needed orders." By letter dated December 14, 1949, Cerascal mentioned for the first

that you would have a handle on the left side of the machine by July 18, 1949;

that you are to eliminate the use of 'Glycolator' labels on cartons and we are to furnish labels for this as soon as possible;

that you and we both were to try to find a better pouring spout;

that we are to furnish you, immediately, an instruction tag to fasten to the machine.

"Confirming the telephone conversation with your Gene Colestock of today regarding the metal plate on the thermostat knob:

this plate is to be used. The decal we have coming up does not take the place of this metal plate. You are to arrange with your supplier to have the following on the bottom of this plate:

'Cerascal Chemical Corporation
Lafayette, Indiana'

"It was further agreed that you would step up production, and that you would meet the following schedule:

"Week starting July 3, 1949 – 200 units
"      "      July 10, 1949 – 300 units
"      "      July 17, 1949 – 400 units
and 500 units per week thereafter.

"You had on hand orders for 800 units and they were scheduled to be shipped as follows:

"Week of July 3, 1949;    Allied Plumbing and Heating Service, Wayne, Michigan
Consolidated Heating and Supply Co., St. Louis, Mo.

"Week of July 10, 1949;    Elmer Hill Distributing Co., Chicago, Illinois
Distributors, Inc., Seattle, Washington
W. H. Breinholt Co., Salt Lake City, Utah

"Week of July 17, 1949;    McDonald Bros., Memphis, Tennessee
Air Capital Manufacturing Co., Wichita, Kansas
Consolidated Heating and Supply Co., St. Louis, Mo.

"It was agreed that you were to send us, the same day the shipment was made, the order notify bill-of-lading on all shipments except those going to Chicago. On the Chicago orders we are to enclose with our order a sight draft, properly made out and signed, with a letter of transmittal to bank. You are to endorse the bill-of-lading, put them all in the envelope we provide and drop it in the mail.

"In order that we can pick up the money we advanced you, it was agreed that: on the two shipments you make this week we would not pay you any money; on the first shipment the week of the 10th, we were to send you our check in full payment for the amount of the shipment as soon as we receive the bill-of-lading. On the second shipment we would send you no money. On the third shipment we would send you a check.

then, on the week of the 17th, on the first shipment we were to take all; on the second shipment we were to send you our check, and the third shipment we were to take all. On the fourth shipment we were to send you our check.

on the first shipment the week of the 24th, we were to take all and pay you for the other four shipments you would make

time in writing the sixty-four units they have claimed were converted by Design.[3] This letter was not answered by Design.

Except for the self-serving declarations in the last referred to letter, and the letter of February 15, 1950,[4] which also remained

that week. Starting the first of August, we will arrange to clean up any balance that might be left and as soon as this is done then all payments will be made to you immediately upon our receipt of the bill-of-lading.

"We are sending you, the first of next week, two copies of the sales agreement that was discussed yesterday, with the changes made that we agreed on. We will appreciate it if you will send us a copy of the patent application so we can make them a part of this agreement. We believe that this is a fairly complete resume of our conversation, and we trust that things will go smoother from now on.

"Very truly yours,
"Ceraseal Chemical Corp
"[signed] Paul

"Paul Abraham
"PA:sy       Vice President"

3.                     "December 14, 1949
"Registered Letter
"Design Engineering Company

"310 Cedar Street
"St. Paul, Minnesota
"Gentlemen:
"We are writing to you today asking you to send us your check in the amount of $4,490.84. Our books show this to be the amount we have advanced you over and above your shipments to us.

"We are also making demand upon you to repair and return, at once, to our distributors the defective vaporizers which have been sent back to you. Some of these have been in your hands for several weeks. Your lack of response has cost us many sales.

"You have promised several times to write to us regarding the repair of these defective units and regarding the settlement of the moneys advanced to you.

"Since you have not done this and for several other reasons we are demanding the return of moneys advanced to you.

"Very truly yours,
"Ceraseal Chemical Corporation
Paul Abraham
"President."
"PA/sy

4.                                         "February 15, 1950
"Design Engineering Company
"310 Cedar Street
"St. Paul, Minnesota.
"Gentlemen:
"On the 26th of January, which was almost three weeks ago, in our discussion at Chicago you advised us that all of the units that had been returned to you for repair would be repaired and shipped before the 4th of February and that you would advise us, sending us copies of bills-of-lading etc. We have heard nothing from you regarding this and know that you have not kept your word and have not shipped any of these machines back to our distributors. We have records in our office here showing that you have received the following machines from the distributors as indicated:

| "Name & Address | No. of Units | Date shipped | Amount |
|---|---|---|---|
| Adams & Shaw Knoxville, Tennessee | 6 | 10/10/49 | $ 84.00 |
| Consolidated Heating & Supply St. Louis, Missouri | 6 12 | 10/21/49 11/28/49 | 84.00 168.00 |
| Kirby Sales & Distributing Co. Indianapolis, Indiana | 8 | 11/23/49 | 112.00 |
| Air Purification Co. Cincinnati, Ohio | 6 6 6 | 11/2/49 11/18/49 12/20/49 | 84.00 84.00 84.00 |
| Erwin Equipment Company Omaha, Nebraska | 7 | 11/22/49 | 98.00 |
| *Ceraseal Chemical Corporation Lafayette, Indiana | 6 — 63 | 12/12/49 | 84.00 $882.00 |

*3 – Allied Heating & Plumbing Co., Wayne, Michigan
 1 – McDonald Brothers, Memphis, Tennessee
 2 – Ceraseal Chemical Corporation, Lafayette, Indiana

unanswered by Design, there is nothing in the record to support the claim of conversion by Ceraseal.

In support of Design's counterclaim there is nothing of importance except the testimony of its officers to the effect that they advised Ceraseal verbally that Design had to have orders for 3,000 units per month, and that without formal orders therefor the silence of Ceraseal amounted to acquiescence. Design emphasizes that it went into production at Ceraseal's request and discontinued manufacturing for all other customers, and to that end had invested about $25,000. Design admits that at the time of the July 7th meeting it had a credit balance in excess of $7,000 and would need about $4,100 of that to keep production going. Design also admits they had no authority to collect from Ceraseal's customers by sight draft, but did so because Ceraseal did not oppose this method of financing the deal. Ceraseal contends that the continuation of this practice prompted its officers to arrange for the meeting of July 7th. At this time Ceraseal claims Design was behind 800 orders and that the only mention of "3,000" was the remark of Design's president that in order to manufacture 500 units per week they would be required to stock parts for 3,000 units, and that, according to Ceraseal, was Design's affair, as Ceraseal was only "interested in schedules."

The foregoing discussion of the evidence and contentions of the parties will suffice to point out the sharp conflict between the testimony of the parties.

Taking up first Ceraseal's claim of conversion, the record impresses me that there was no conversion. There were no earmarks on the vaporizers connecting them with Design, and Design did not authorize their return for cleaning. It does not appear that there was exercise of complete ownership and dominion over the 64 units by Design. True, it stripped some of them, looking for claimed defects, and finding they were returned for cleaning only, they were left for Ceraseal or the owners to pick up. Certainly a failure to function, attributed to dirt from the customers' premises, does not constitute a defect covered by a warranty of the manufacturer, and failure of Design to reassemble and return the units under the circumstances here existing does not constitute conversion.[5] The action for conversion is dismissed.

It is so ordered.

The $4,080.60 had and received by Design must be accounted for to Ceraseal, unless the evidence sustains Design's counterclaim. Both parties are at fault for not reducing their contract to a formal writing. They did not do this. That is why they are now so far apart in their claims and contentions. That Design may have been misled by the sales talk of Ceraseal is easy to understand. But there is no justification for Design's inexcusable neglect to answer the one-sided correspondence initiated by Ceraseal and quoted above. Where the evidence is so controversial as the record of the instant case discloses, the trier of the facts must assume that the

"In addition to these you have received some units from Allied Plumbing and Heating Company of Wayne, Michigan. The quantity is somewhere between fifteen and twenty.

"This is to advise you that we are, this day, replacing all of these units out of our stock except the last mentioned items to Allied Plumbing and Heating Company which we do not know the exact number. If you will advise us of the number you have received from them we will also replace these. Do not ship any of these units listed above to the distributors. These units now belong to us. We will charge your account with the sixty-three units at $14.00 each in the amount of $882.00

"In our discussion of January 26, you also promised to send me one of the new units by February 4th. This has not arrived which is not surprising as you have failed to keep your promise on one single thing.

"Very truly yours,
"Ceraseal Chemical Corporation
Paul Abraham
"President"

"PA/sy

5. 2 Dunnell's Minnesota Digest, § 1926 and citations.

statements made by Ceraseal in the correspondence referred to, and which remained unanswered up to the time of trial, tips the scales weighing the evidence so that it inclines towards Ceraseal. The burden on the defendant in support of its counterclaim is not carried, and the counterclaim must be, and the same hereby is, dismissed.

Costs are not allowed to either party.

It is so ordered.

Plaintiff may submit findings of fact, conclusions of law, order for judgment in the sum of $4,080.60 in favor of plaintiff, and form of judgment, consistent with the foregoing.

An exception is allowed.